UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| EGG CLEARINGHOUSE, INC., Plaintiff, | ) | |
| v. | ) | Civil No. 1:07-cv-73-JM |
| WAYNE CLAPPER, Defendant. | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The plaintiff, Egg Clearinghouse, Inc. ("ECI ), complains and alleges against the defendant, Wayne Clapper ("Clapper ), as follows:

**INTRODUCTION**

1. ECI brings this action for damages and other available remedies based on Clapper's deliberate and unlawful attempts to access ECI's proprietary trade secret information through ECI's internal computer system to which Clapper, ECI's former president, gained unauthorized access. Specifically, Clapper's misconduct, described below, violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the New Hampshire Computer Crimes statute, N.H. Rev. Stat. § 638:17, and is a misappropriation of trade secrets in violation of N.H. Rev. Stat. § 350–B and the common law.

**PARTIES**

2. ECI is a Delaware corporation with its principal place of business in Dover, New Hampshire.

3. Clapper is an individual who, on information and belief, resides in Dover, New Hampshire.

## JURISDICTION

4. The Court has jurisdiction over ECI's federal claims pursuant to 28 U.S.C. §§ 1331 and 1338(a). The Court has jurisdiction over ECI's state law claims pursuant to 28 U.S.C. § 1338(b).

## FACTUAL BACKGROUND

5. ECI is a nationally recognized marketplace for buyers and sellers of eggs.

6. Employing a unique trading system known as "Price Discovery, ECI conducts a true auction, unique in the industry, which ensures fair prices.

7. A critical element of ECI's Price Discovery system is that all trading is blind. Individual buyers and sellers of eggs do not know each other's identities until after the terms of a sale have been agreed to.

8. Buyer–seller anonymity ensures the economic purity of the ECI marketplace

9. Because of the importance of maintaining a blind trading system, ECI scrupulously guards access to its computer system and the information regarding egg sales and prices that can be accessed through that system at any given time.

10. The misuse of ECI's proprietary computer system and the confidential and proprietary information stored in that system would seriously compromise ECI's reputation for providing a level trading floor for egg sales between anonymous buyers and sellers.

## CLAPPER'S HISTORY WITH ECI

11. From December 1983 until May 12, 2006, Clapper was employed by ECI in various capacities.

12. At the time of his termination, Clapper held the position of General Manager and President of ECI.

13. On May 12, 2006, ECI terminated Clapper for engaging in gross misconduct by revealing ECI trade secrets and business practices to third parties, attempting to set up a trading system based on ECI's unique model in Japan and elsewhere for his own personal benefit, operating his own personal business from ECI, and engaging in inappropriate behavior in the work place, including downloading and storing music files and pornographic movies.

14. In connection with his employment, before he was terminated, Clapper agreed to protect ECI's confidential business information and trade secrets, and he agreed that he could be subject to disciplinary action (including possible discharge) and legal action for disclosure of such information, even if he did not actually benefit from the disclosure.

15. In connection with his employment, before he was terminated, Clapper agreed that he would not act so as to create any conflicts of interest between ECI and Clapper with respect to any transaction or business dealings involving third parties, and Clapper agreed that he could be subject to disciplinary action (including possible discharge) and legal action for engaging in any such activities.

16. In connection with his employment, before he was terminated, Clapper agreed that he would not compete with ECI for one year from the conclusion of his employment.

17. By virtue of his role as President of ECI, Clapper had access to confidential and proprietary information pertaining to ECI's egg trading system,

including, but not limited to, financial information and records, marketing and development plans, proposals and strategies, sales information, business forecasts and plans, contracts, customer information, pricing information, proprietary practices and policies, computer software, and other information.

18. This confidential information relating to ECI's business is not generally available to the public and has been developed by ECI with considerable effort and expense.

19. Beginning as early as 1998, Clapper exploited his access to confidential and proprietary information to create economic opportunities for himself at the expense of ECI.

20. Purportedly acting on behalf of ECI, and on letterhead of ECI, containing ECI's trademarks, Clapper sent a proposal for a "turnkey system to a Danish organization, Nord Ei, to set up an egg trading system in Europe based on ECI's unique Price Discovery system.

21. When Nord Ei agreed to the concept, Clapper identified his own company, Web Guild, of which he was the sole proprietor, as the entity that would actually develop and maintain the trading system for Nord Ei, not ECI.

22. Clapper submitted a proposal on behalf of Web Guild, which was accepted by Nord Ei in August 1998.

23. The separate egg trading business now operates in Europe under the name of Ex Trade, and, according to Clapper, controls approximately 70% of all eggs traded in the European Union.

24. At Clapper's direction, Nord Ei paid at least $30,000 directly to Web Guild to develop the Ex Trade trading system. ECI never received any compensation from Nord Ei or anyone else relating to the Ex Trade trading system.

25. Clapper did not obtain the approval of ECI for this separate European business, and did not inform the governing Executive Committee or the full Board of Directors about the financial and other arrangements for this separate business.

26. In approximately 2002, purporting to act on behalf of ECI, Clapper attempted to set up a similar egg trading system in Mexico.

27. Although the Mexican egg trading system is not yet operational, according to Clapper, once the Mexican Egg Producers Association can address a couple of remaining issues, it should begin operation.

28. Clapper did not obtain the approval of ECI for this separate Mexican business, and did not inform the Executive Committee or the Board of Directors about the financial and other arrangements for this separate business.

29. In approximately 2005, Clapper entered into discussions with the Japan Egg Producers Association ("JEPA ) about ECI's egg trading system.

30. In December 2005, Clapper took a trip to Japan, with all expenses paid by JEPA, including first class airfare, to describe the ECI trading system to JEPA. Clapper spent several days in Japan explaining the ECI trading system to JEPA.

31. During the trip to Japan, Clapper provided a schematic of the ECI trading system to JEPA, and gave a PowerPoint presentation about ECI and its trading system to JEPA.

32. On every page of the PowerPoint presentation, Clapper included the name, "Egg Clearinghouse, Inc., and ECI's trademarks, falsely implying that ECI sponsored and approved of the presentation.

33. In the PowerPoint presentation, Clapper falsely suggested that ECI, as opposed to Clapper's company, Web Guild, had sponsored the egg trading systems in Europe and Mexico based on ECI's unique and proprietary system.

34. Following Clapper's trip to Japan and his presentation, Clapper had further discussions with JEPA about developing an egg trading system in Japan based on the unique and proprietary ECI system. Clapper had projected the programming costs alone for the Japanese business venture to be $100,000. Clapper did not project that any payments or remuneration would be paid to ECI.

35. Clapper proposed a contract (which had not been executed by the time he was terminated) between JEPA and CLAPHAN LLC, a company Clapper was attempting to set up and co–own with Andy Hanson, and in which JEPA would pay CLAPHAN LLC $400,000 under a two–year contract to set up the ECI trading system in Japan, and JEPA would pay CLAPHAN LLC $200,000, plus travel expenses for at least three trips a year to Japan, for monitoring and maintaining the ECI trading system in Japan.

36. In 2005 and 2006, Clapper met with representatives of JEPA in Washington, D.C. and Atlanta, and he invited numerous representatives from JEPA to come to New Hampshire in July 2006 to inspect and observe ECI's operations.

37. Clapper did not obtain the approval of ECI for this separate Japanese venture, and did not inform the Executive Committee or the Board of Directors about the financial and other arrangements for this separate venture.

38. During the course of its investigation of Clapper after it learned in April 2006 of some of the details of Clapper's proposal to set up an ECI trading system in Japan, ECI learned not only of the extent of Clapper's efforts to set up egg trading systems in Europe, Mexico, and Japan based on ECI's unique and proprietary system, but it also learned of the extent of Clapper's other separate business ventures operated at the offices of ECI utilizing the resources and personnel of ECI, and Clapper's other inappropriate behavior in the workplace.

39. Operating through his company, Web Guild, for years, Clapper has designed and hosted Internet web sites at ECI for numerous unrelated companies and entities, such as a coin dealer, http://www.tombeckeronline.com, and an insurance company, http://www.fordinsurance.com, as well as Clapper's own company, Web Guild, http://webguild.dover.net, in which he solicited business on behalf of his company.

40. Utilizing his company, Web Guild, Clapper also designed and hosted Internet web sites at ECI for companies and entities in the egg business, such as the American Egg Board ("AEB ), http://www.aeb.org.

41. Following his termination from ECI, upon information and belief, Clapper demanded $200,000 from AEB for return of AEB's domain name, which he threatened to redirect to a pornographic web site, and he only surrendered AEB's domain name to AEB after AEB filed suit in federal court and obtained an injunction against him, *American Egg Board v. Wayne Clapper*, Case No. 06 C 7111 (N.D. Ill.).

42. Clapper not only maintained the servers that hosted the web sites at ECI, but he also maintained the business records for his separate company, Web Guild, at

ECI's offices, and he prepared and mailed from ECI invoices to Web Guild clients, which were payable directly to Clapper at his home in Dover, New Hampshire.

43. Upon information and belief, Clapper obtained compensation for designing and hosting web sites at ECI. ECI did not receive any compensation or other remuneration for designing or hosting the web sites.

44. In addition to operating the web sites from ECI offices, Clapper utilized ECI personnel whom he supervised to maintain, operate, and provide technical support for the web sites of his Web Guild clients.

45. Clapper did not obtain the approval of ECI for these separate web design and hosting businesses, and did not inform the Executive Committee or the Board of Directors about the financial and other arrangements for these separate businesses.

46. After placing Clapper on paid administrative leave, ECI immediately suspended Clapper's access to ECI's computers, and conducted an inspection of Clapper's desktop computer and his office at ECI.

47. On May 2, 2006, Clapper was provided written notice by ECI that "[u]ntil further notice, you are not permitted to come to the office, *attempt to access computers at the office*, or contact individuals at ECI. (emphasis added).

48. As part of its investigation, ECI directed Clapper to return his ECI laptop computer, cell phone, and personal digital assistant, which he provided a day or two later.

49. Inspection of Clapper's laptop from ECI revealed that 2,355 files, containing 3.3 Gigabytes of data, had been deleted from the computer, apparently using a utility designed to thwart recovery of ordinarily deleted files.

50. The deleted files included all documents, including all word processing documents, all spreadsheets, all PowerPoint presentations, all JPEG files (photographs), and indeed, all contents of the folder "My Documents, and the deleted files also included all e–mail, and, indeed, the entire Microsoft Outlook folder. There were no ECI files or documents remaining on the laptop computer.

51. Utilizing recovery software, some of the deleted files were recovered, including Clapper's PowerPoint presentation to the Japan Egg Producers Association.

52. On Clapper's desktop computer connected to the ECI network, inspection revealed 11,536 downloaded MP3 files.

53. Clapper also maintained on his desktop computer connected to the ECI network video folders, such as "Hardcore (in "My Videos ), which contained a total of over 11 Gigabytes of hard core pornographic movies.

54. The movies for which downloading information was available appeared to have been downloaded during normal business hours on weekdays.

55. ECI was not aware and did not approve of Clapper's downloading and storing of MP3 files and hardcore pornographic movies.

56. Immediately after becoming aware of Clapper's improper conduct, on May 12, 2006, ECI fired Clapper for gross misconduct.

57. Clapper's authorization to access the ECI computer system for any purpose ended, on May 2, 2006, when he was administratively suspended, and ended permanently, on May 12, 2006, when he was terminated.

**CLAPPER ATTEMPTS TO ACCESS THE ECI COMPUTER SYSTEM**

58. To protect against improper use of the ECI computer system and information stored in that system, the ECI computer system has been designed to send alert messages by email to ECI technical staff any time the system detects an unauthorized use of the computer system or an unauthorized attempt to access the computer system remotely through the Internet.

59. On or about January 20, 2007, at approximately 10:26 p.m., the ECI computer system generated a series of alerts indicating that an unauthorized user was attempting to access an area of ECI's internal web site that had originally been specially designed for Clapper's use.

60. Based on the nature of the access attempts described in the alerts, these attempts to access the ECI computer system appeared to be intentional.

61. ECI technical staff identified the unique "IP address of the computer that had been used to make these unauthorized attempts to access the ECI computer system. That IP address was the numerical string, 24.61.110.224.

62. ECI technical staff used the web site, http://www.geobytes.com/IPLocator.htm, to pinpoint the location from which the unauthorized user had attempted to gain access to the ECI computer system. This web site provides the physical location assigned to the unique IP address of a particular computer.

63. The location assigned to the IP address, 24.61.110.224, was Dover, New Hampshire, the city in which Clapper resided at that time.

64. ECI technical staff determined that a person using the computer assigned to this IP address had made a number of unauthorized attempts to access the ECI computer system between January 20, 2007, and January 24, 2007, some of which were successful.

65. On January 20, 2007, the unauthorized user made queries to market sheets containing proprietary information regarding egg pricing made on January 26, 2005, January 15, 2007, and January 20, 2007.

66. That same day, the unauthorized user attempted twice to access a menu page of the ECI internal web site.

67. That same day, the unauthorized user accessed a specific page of the ECI internal web site that provided weather information.

68. On January 21, 2007, the unauthorized user made multiple queries to the market sheets for January 20, 2007, and January 21, 2007.

69. On January 22, 2007, the unauthorized user made queries to the market sheets for January 15, 2007, and January 22, 2007.

70. On January 23, 2007, the unauthorized user made a query to the market sheet for that day.

71. On January 24, 2007, the unauthorized user made queries to the market sheets for January 24, 2006, January 24, 2007, and October 24, 2003.

72. Between January 24, 2007, and February 1, 2007, the unauthorized user made similar queries for market sheets or other market data relating to that time period.

73. The pages of ECI's internal web site the unauthorized user attempted to access contain menus that enable the user to access highly confidential trading

information, including information about ECI's members, ECI's business contacts, credit management, market data, and sales statistics. The internal web site also has forms that allow a user to access information on specific trades and ECI's current payables and receivables.

74. The pages of ECI's internal web site the unauthorized user successfully accessed contain proprietary information that ECI is licensed to use by a third party provider, but is not licensed to publish or otherwise share with third parties, and ECI is contractually obligated not only to protect the confidentiality of such information, but to inform the third party provider of any security breaches.

75. Moreover, the format of the market sheets the unauthorized user accessed is proprietary to ECI, designed to give ECI staff quick reference to market and sales information not disclosed to anyone outside ECI.

76. Prior to his termination, Clapper often informed ECI employees that this information was confidential and proprietary and must be protected from disclosure to others.

77. Because some of the internal web sites the unauthorized user attempted to access had been specifically designed for Clapper, because of Clapper's familiarity generally with the ECI computer system, because of the contentiousness that accompanied Clapper's termination from ECI, and because of Clapper's demonstrated record of using ECI computer systems, equipment, and proprietary information for his own personal purposes, ECI technical staff suspected that Clapper was the unauthorized user described above.

78. By comparing the IP address of the unauthorized user with the IP address from which Wayne Clapper had recently sent email messages to ECI's counsel, ECI technical staff was able to confirm that the computer used to make these unauthorized attempts to access the ECI computer system was the same computer Wayne Clapper used to send those email messages.

79. On information and belief, Wayne Clapper made the unauthorized attempts to access the ECI computer system described above.

80. Upon information and belief, Clapper's unauthorized access to ECI's computer system began at about the same time he began a new job with C&O Foods, which is an egg broker and a member of ECI, and is also a competitor of ECI.

81. If Clapper conveyed ECI's confidential and proprietary information to C&O Foods, it would have a significant advantage in making trades through ECI, or competing with ECI in the egg trading business.

82. ECI's concern on this score is heightened because of Clapper's past misconduct in using ECI proprietary information for his own financial gain to the detriment of ECI.

**FIRST CLAIM FOR RELIEF**
**[Federal Computer Fraud and Abuse]**

83. ECI repeats the allegations of the preceding paragraphs as if fully set forth in this paragraph.

84. Clapper knowingly and with intent to defraud destroyed information on the ECI laptop.

85. Clapper knowingly and with intent to defraud improperly used ECI computers in order to operate his separate businesses and to download MP3 and pornographic movies.

86. Clapper knowingly and with intent to defraud accessed ECI's protected computer system in order to gain access to confidential and proprietary information.

87. Clapper did not have authorization from ECI for any of the activities alleged above.

88. ECI was damaged as a result of Clapper's unauthorized access of its protected computer system in an amount to be determined at trial.

89. By reason of the foregoing, Clapper has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

**SECOND CLAIM FOR RELIEF**
**[State Computer Fraud and Abuse]**

90. ECI repeats the allegations of the preceding paragraphs as if fully set forth in this paragraph.

91. Clapper knowingly accessed ECI's protected computer system in order to gain access to confidential and proprietary information knowing that he was not authorized to do so.

92. Clapper did not have authorization from ECI for any of his activities alleged above.

93. ECI was damaged as a result of Clapper's unauthorized access of its protected computer system in an amount to be determined at trial.

94. By reason of the foregoing, Clapper has violated N.H. Rev. Stat. § 638:17.

**THIRD CLAIM FOR RELIEF**
**[Misappropriation of Trade Secrets]**

95. ECI repeats the allegations of the preceding paragraphs as if fully set forth in this paragraph.

96. ECI's unique egg trading system involves certain trade secrets that derive economic value from not being generally known to anyone other than ECI.

97. ECI takes every precaution to prevent these trade secrets from being discovered by egg producers who trade on ECI's market.

98. ECI has made all reasonable efforts under the circumstances to maintain the secrecy of this information.

99. As described above, Clapper used improper means to acquire ECI's trade secrets for disclosure to third parties.

100. Clapper acquired access to ECI's trade secrets under circumstances giving rise to a duty to maintain their secrecy.

101. In spite of that duty, Clapper disclosed or used one or more trade secrets of ECI without ECI's express or implied consent.

102. At the time of the disclosure or use, Clapper knew or had reason to know that his knowledge of the information involved a duty to maintain its secrecy.

103. Clapper's misappropriation of ECI's trade secrets has harmed ECI.

104. By reason of the foregoing, Clapper has misappropriated ECI's trade secrets, in violation of N.H. Rev. Stat. § 350–B and the common law.

## CONCLUSION

WHEREFORE, ECI respectfully requests that the Court:

A. Enjoin Clapper from accessing or attempting to access ECI's computer system;

B. Enjoin Clapper from disclosing ECI's trade secrets to his employer or any third party, or improperly competing against ECI based on his knowledge of those trade secrets;

C. Order Clapper to account for all gains, profits, and advantages derived by him through his misappropriation of trade secrets;

D. Award such compensatory, statutory, enhanced, or punitive damages as the Court deems proper;

E. Order Clapper to pay to ECI the costs of this action, including ECI's reasonable attorneys' fees; and

F. Award any other and further relief the Court deems just.

## DEMAND FOR JURY TRIAL

ECI demands a trial by jury of all issues in this case so triable.

Respectfully submitted,

Dated: March 14, 2007

/s/ Thomas Closson
Thomas Closson [N.H. Bar # 9966]
tclosson@nhlaborlaw.com
FLYGARE, SCHWARZ & CLOSSON
11 Court Street, Box 439
Exeter, NH 03833
Phone: (603) 778–7300
Fax: (603) 778–7373

Peter J. Brann
pbrann@brannlaw.com
(seeking *pro hac vice* admission)
David Swetnam–Burland
dsb@brannlaw.com
(seeking *pro hac vice* admission)
BRANN & ISAACSON
184 Main Street; P.O. Box 3070
Lewiston, ME 04243–3070
Phone: (207) 786–3566
Fax: (207) 783–9325

*Attorneys for Plaintiff*